<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **AURORA KIM PARADISIS,** | **Civil Action No. 13-5936** |
| *Plaintiff*, | **OPINION** |
| v. | |
| **ENGLEWOOD HOSPITAL AND MEDICAL CENTER,** | |
| *Defendant.* | |

**THIS MATTER** comes before the Court on Defendant Englewood Hospital and Medical Center's ("Defendant" or "Hospital") Motion for Summary Judgment against <u>pro se</u> Plaintiff Aurora Kim Paradisis ("Plaintiff" or "Paradisis"). Dkt. No. 58. For the reasons set forth below, Defendant's motion is **GRANTED**.

### I.   BACKGROUND

In this employment suit under Title VII of the Civil Rights Act of 1964 ("Title VII"), Ms. Paradisis, a nurse for Defendant Englewood Hospital and Medical Center, asserts that she was discriminated against on the basis of her color, race, and national origin and that she was retaliated against for engaging in protected activities.[1]

---

[1] The Court notes that Plaintiff failed to comply with Local Civil Rule 56.1, which requires the non-movant to file a responsive statement of undisputed material facts. Plaintiff did not properly respond to each paragraph of Defendant's 56.1 statement because she grouped paragraphs together, added additional unrelated paragraphs, and duplicated series of paragraphs throughout her responses. In addition, Plaintiff improperly issued a blanket denial of Defendant's paragraphs numbered 76 through 266. Finally, Plaintiff repeatedly cited to "Paradisis Decl.," which consists of only two paragraphs and attaches thousands of pages of unmarked exhibits. Nevertheless, as

Ms. Paradisis is a Puerto Rican woman of Afro-Caribbean descent.  Plaintiff's Responsive R. 56 Statement of Material Facts ("Pl.'s Resp. R.56 Stmt.") ¶ 2(2),[2] Dkt. No. 63-2.  In 1995, Plaintiff began working at the Hospital as a student nurse intern.  Plaintiff's Supplemental R. 56 Statement of Material Facts ("Pl.'s Supp. R.56 Stmt."), at p. 2, Dkt. No. 63-3.  In the ensuing years, Plaintiff worked at the Hospital as a nursing assistant, MCH float nurse, Care Manager of the Pediatric Unit ("PEDS"), and Patient Care Director of the Mother/Baby Unit.  Id.

In 2001, Plaintiff left full-time employment at the Hospital to pursue other career opportunities, but continued at the Hospital as a casual per diem nurse.  Defendant's R. 56 Statement of Material Facts ("Def.'s R.56 Stmt.") ¶ 9, Dkt. No. 58-2.  A casual per diem nurse works when the Hospital's needs coincide with the employee's availability, and is not guaranteed work.  Id. ¶ 11; Declaration of James J. Panzini, Esq. ("Panzini Decl."), Ex. 28, Dkt. No. 58-3.

## A.  Plaintiff's 2012 Termination and Reinstatement

On January 18, 2012, Plaintiff was terminated, effective January 20, 2012, for failing to make herself available to work a winter holiday.  Def.'s R.56 Stmt. ¶ 12.  Plaintiff filed a grievance with her Union, Health Professionals and Allied Employees Local 5004 ("Union"), for unlawful termination.  Id. ¶ 13.  The Union ultimately provided documentation to the Hospital showing that Plaintiff had developed pneumonia and was unable to work her shift on New Year's.  Id. ¶¶ 14-

---

Plaintiff is proceeding pro se, the Court "may draw the relevant facts underlying the claims from available sources such as the complaint, deposition testimony, the moving litigant's Local Civil Rule 56.1 statement of undisputed material facts and supporting exhibits." Athill v. Speziale, No. 06-4941, 2009 WL 1874194, at *2 (D.N.J. June 30, 2009) (citing Jordan v. Allgroup Wheaton, 218 F.Supp.2d 643, n.2 (D.N.J. 2002), aff'd 95 F. App'x 462 (3d Cir. 2004)).  As such, the Court will take the allegations in Defendant's Statement that have evidentiary support as admitted unless the Court can reasonably identify a material counter-fact from the available sources.

[2] Plaintiff's Complaint, Responsive Statement of Material Facts, and Supplemental Statement of Material Facts include duplicate sets of numbers.  In the interest of clarity, the Court will refer to specific paragraphs by their number, with the page number in parenthesis.  For example, Compl. ¶ 6(2) will denote paragraph 6 on page 2.

16.  As a result of negotiations between the Union and Hospital, Plaintiff was reinstated to her per diem status on May 17, 2012.  Id. ¶ 17.

**B.  Plaintiff's Education and Training Requests**

1.  Plaintiff's Requests for and Receipt of Education and Training

On June 25, 2012, Plaintiff sent a letter to the Hospital stating that before she could return to work, the Hospital needed to provide additional training that she believed was necessary.  Id. ¶ 20.  On August 29, 2012, in a letter to Filmore Flores ("Flores"), Plaintiff's supervisor, and Shaija George ("George"),[3] the Patient Care Director ("PCD") of Maternity and the NICU, Plaintiff requested: (1) registration for the September 17, 2012 Neonatal Resuscitation Program ("NRP") course; (2) registration for either the October 20 or 27, 2012 Pediatric Advanced Life Support ("PALS") course; and (3) computer training and shadowing of an MCH float member through the Neonatal Intensive Care Unit ("NICU"), PEDS, and the Mother/Baby Unit.  Id. ¶ 33.  Training programs at the Hospital were offered through the Center for Nursing Practice ("CNP").  Id. ¶ 34.

On September 17, 2012, Plaintiff received NRP training.  Id. ¶ 36.

On October 9, 2012, Plaintiff emailed Mr. Flores and again requested registration in a PALS course.  Id. ¶ 48.  Ms. George and an educator in the CNP both advised that PALS certification was not required to work in PEDS.  Id. ¶ 49.  When Mr. Flores communicated this to Plaintiff, she said that he was "misinformed."  Id. ¶ 51.  The Director of the CNP also told Mr. Flores that an RN working in the pediatric unit does not need PALS certification.  Id. ¶¶ 52-53.  The Hospital's Unit-Specific Requirements did not require MCH float nurses like Plaintiff to obtain PALS certification.  Id. ¶¶ 56, 153, 154; Panzini Decl. Ex. 18.

---

[3] In a footnote of her Local Rule 56.1 Response, Plaintiff "moved to strike" Ms. George's deposition testimony from September 14, 2015.  See Pl.'s Resp. R.56 Stmt. at 35, n.20.  Since Plaintiff was given notice and an opportunity to attend, see Dkt. No. 42, there is no reason to strike Ms. George's September 14, 2015 deposition testimony.

Following her NRP training in September, Plaintiff requested a "computer training refresher" so she could transition back into her per diem role.  Def.'s R.56 Stmt. ¶ 43.  On October 5, 2012, Mr. Flores advised Plaintiff that she would be provided with one day (eight hours) of computer training during the first week of November.  Id. ¶ 44.  Due to Hurricane Sandy, Plaintiff only received four hours of classroom computer training on November 2, 2012.  Id. ¶ 66.  Nevertheless, Plaintiff testified that she was "allowed to work absent the education and training."  Id. ¶¶ 68, 252.  In January 2013, Plaintiff returned to work.  Id. ¶¶ 67, 69.

2.  Plaintiff's Training and Education Grievance

On February 12, 2013, Plaintiff emailed Ms. George, Mr. Flores, and the Local President of the Union, again complaining about the alleged improper training she had received upon her return to the Hospital.  Id. ¶ 118.  Plaintiff said she would be available beginning March 1, 2013 to start an orientation program.  Id.

On February 21, 2013, Plaintiff filed a grievance through the Union, alleging that the Hospital failed to provide her with adequate education and training.  Id. ¶ 20.  On March 13, 2013, Plaintiff, her union representative, and several Hospital representatives met to discuss the education and training grievance.  Id. ¶¶ 127, 150.  Ann Marie Shears ("Shears"), the Vice President of Clinical Services, explained that because Plaintiff was a casual per diem employee, the Hospital was not obligated to provide her with all of her specific education and training requests.  Id. ¶ 151.  Plaintiff argued that the training was "prudent" and that she should not have returned to work without it.  Id. ¶ 152; Panzini Decl. Ex. 4, Ex. P-3F, at p.28.  Plaintiff again requested PALS certification, but Ms. Shears and Ms. George explained that neither the State nor the Hospital require PALS certification for per diem nurses, and that the Hospital has full-time pediatric residents for that purpose.  Def.'s R.56 Stmt. ¶¶ 153-154.

Plaintiff testified that during the March 13, 2013 meeting, Ms. Shears "mouthed" to her

"[w]hy don't you pay for it yourself," as well as "something like '[y]ou people want everything handed to you.'"  Id. ¶ 158.  These statements do not appear on the transcript of Plaintiff's audio recording of the meeting.  Id. at 35, n.14; Panzini Decl. Ex. 4, Ex. P-3F.[4]

Because Plaintiff was not entitled to the requested education and training under the CBA, her grievance was denied.  Id. ¶ 160.  Nevertheless, the Hospital agreed, although it was not required, to provide Plaintiff with "[u]p to eight hours" of additional education and training.  Id.; Panzini Decl. Ex. 4, Ex. D-20.  The Union agreed to postpone the next step of the grievance process until the orientation was completed.  Def.'s R.56 Stmt. ¶ 161.  As further explained below, although the Hospital ultimately scheduled orientation for June 28, 2013, Plaintiff failed to attend.

**C.  January 31, 2013 Safety Issues**

   1.  Complaints and Investigation

On January 31, 2013, Plaintiff worked an overnight shift in the Mother/Baby Unit.  Id. ¶ 70.  During and following the shift, three nurses brought several safety issues regarding Plaintiff's performance to the attention of Ms. George, the Patient Care Director of Maternity.  Id. ¶ 71.

The nurses reported that Plaintiff failed to submit an OptiVox report[5] on all patients, failed to provide a Hepatitis B vaccine to a patient prior to discharge, and failed to administer the Hospital's Postpartum Depression Screening.  Id. ¶¶ 74-88, 93.  Ms. George initiated an investigation into the allegations and confirmed that Plaintiff had not fulfilled these requirements.  Id. ¶¶ 89-95.  Ms. George also received additional complaints from a patient who was under Plaintiff's care during the January 31, 2013 shift, who reported that Plaintiff was uncaring and not helpful, and that Plaintiff did not do any teaching, share information, or visit the patient's room as

---

[4] Plaintiff also separately alleged that in November 2012, upon meeting Plaintiff for the first time, Ms. George said "Oh, you're Kim Paradisi?  I pictured you big and tall."  Id. ¶ 249.
[5] According to Hospital policy, "Handoffs communication can be verbal or recorded via OptiVox."  Id. ¶ 76.  OptiVox is the preferred method for "non-urgent, routine handoff communication."  Id.

often as the other nurses.  Id. ¶¶ 96-99.

Due to these allegations, Ms. George further investigated whether Plaintiff complied with the Hospital's Department of Nursing Rounding Standard.  Id. ¶¶ 99, 100.  The Hospital's policy requires a nurse to perform rounding "every hour from 7AM to 11PM and every two hours from 11PM to 7AM."  Id. ¶ 100.  The rounding sheet is kept in each patient's room so the nurse can sign the sheet to indicate that he or she visited the patient.  Id. ¶ 101.  Ms. George learned that Plaintiff did not sign the rounding sheets for her patients on January 31, 2013 or provide a new rounding sheet for the following shift.  Id. ¶¶ 101-04.

Finally, Ms. George's investigation revealed that Plaintiff inaccurately documented the weight of a baby during her shift.  Id. ¶ 105.  Earlier in the day, another nurse weighed a baby at 7lbs, 8oz, but Plaintiff later inaccurately reported the baby's weight as 7lbs, 3oz.  Id. ¶¶ 106, 108. Despite the baby's apparent (although ultimately erroneous) loss of 5oz of weight, Plaintiff did not alert the doctor or any of the oncoming nurses to arrange for a follow-up.  Id. ¶ 107.

On February 5, 2013, Mr. Flores emailed Plaintiff to schedule an investigatory meeting to discuss the safety issues that had arisen.  Id. ¶ 114.  Plaintiff said that she was not available on the dates provided by Mr. Flores, but stated that she was "beyond confident that the care [her] patients received was stellar and their safety maintained."  Id. ¶ 116.  She also stated that "[i]dle gossip rooted in a gang mentality from the Mother/Baby staff is not of interest to me."  Id.

On March 13, 2013, Plaintiff, her Union representative, and several Hospital representatives met to discuss the safety issues.  Id. ¶ 127.  Ms. George and Mr. Flores testified that Plaintiff was not cooperative during the interview.  Id. ¶¶ 129-130.  Following the meeting, the Hospital determined that Level 1 discipline (a verbal warning) was justified.  Id. ¶ 137.

On April 6, 2013, Plaintiff received a notice of discipline dated March 18, 2013, which

issued Plaintiff a verbal warning for violating the Hospital's service excellence standards/communication standards and code of conduct safe clinical practice.  Id. ¶ 139. Specifically, the warning was issued for Plaintiff's failure to enter an OptiVox shift report for the incoming nurses; failure to administer a Hepatitis B vaccine, Postpartum Depression Screening, and discharge screening on a patient; improper weighing of a baby without adequate follow-up; complaints of an uncaring attitude towards a patient; and a failure to properly perform and document rounding as required by Hospital policy.  Id.

A verbal warning is the lowest form of discipline issued by the Hospital.  Id. ¶¶ 140-41. Ms. George and Mr. Flores both testified that Plaintiff could have received at least a verbal warning for any of the listed offenses, and a more significant warning for the weighing incident.  Id. ¶ 143. When an employee receives a verbal warning, if there are no other issues in the following six months, the warning is removed from the employee's file.  Id. ¶ 141.  As a result of the verbal warning, Plaintiff was not docked any pay, demoted, suspended, or terminated.

2.  Plaintiff's Unjust Discipline Grievance

On April 11, 2013, Plaintiff emailed Ms. George and notified her that she would be filing a grievance for "[u]njust discipline."  Id. ¶ 173.  On April 19th, Plaintiff's union representative emailed Ms. Shears to schedule a grievance hearing for "[u]njust discipline" and "[r]etaliation for filing a grievance."  Id. ¶ 175.

On May 2, 2013, a grievance hearing was attended by Plaintiff, her union representative, Ms. Shears, and Ms. George.  Id. ¶ 179.  Plaintiff's union representative explained that she believed Plaintiff was unjustly disciplined in retaliation for filing her February 21, 2013 grievance requesting training.  Id. ¶ 183.  Ms. George and Ms. Shears explained that the Hospital had notified Plaintiff of the safety allegations and tried to schedule a meeting to discuss them *prior to* Plaintiff's education and training grievance, and thus they could not have been retaliatory.  Id. ¶ 184.  At her

deposition, Plaintiff asserted that at the end of the meeting, Ms. Shears squeezed her hand "very painfully," and that she believed the handshake "had some undertones," although she was "not really sure what they were." Id. ¶ 186. Following the grievance hearing, Plaintiff's discipline was upheld because there was "no indication of retaliatory actions." Id. ¶ 187.

### D. Plaintiff's 2012 Evaluation

On May 14, 2013, Ms. George sent a memo to Plaintiff advising that she had not completed the required self-evaluation, and attaching her annual performance evaluation for 2012. Id. ¶ 189. In the evaluation, Plaintiff received a "Successful" mark in every reviewable category except "Communication," where she received a "Needs Improvement." Id. ¶¶ 193-195. In the category of "Expectations for Performance Improvement," Ms. George noted that Plaintiff should "[r]eview and comply with Service excellence standards, code of conduct and communication standards." Panzini Decl. Ex. 8, Ex. DG-16. Ms. George testified that this was not a negative review, and that Plaintiff was meeting "all the competency that is required to work as a per diem." Def.'s R.56 Stmt. ¶ 196. Mr. Flores testified that it was a "good evaluation," except for the need to improve in Communication. Id. ¶ 197.

On June 7, 2013, Plaintiff notified the Hospital that she would be filing a grievance based on what she perceived to be a "poor evaluation." Id. ¶ 200. On June 18th, Plaintiff's union representative advised her that the grievance would be held in abeyance as the Union and Hospital were working on a settlement. Id. ¶ 206.

### E. Scheduling of Orientation and Plaintiff's Removal from the Schedule

As a result of the March 13, 2013 grievance hearing, the Hospital endeavored to provide Plaintiff with "up to eight hours" of orientation. After unsuccessful discussions of potential orientation dates at the beginning of April, it appears that neither party reached out to the other again until May 20, 2013. On May 20th, Mr. Flores emailed Plaintiff and requested that she attend

8

orientation on June 8th.  Id. ¶ 202.  On May 21st, Plaintiff responded that she was busy on June 8th and could not attend.  Id. ¶ 204.  Plaintiff offered alternative dates of June 14, 21, and 28.  Id.

On June 20, 2013, a nursing educator emailed Ms. George asking whether Plaintiff had provided a response as to whether she would be attending the June 28 refresher skills night.  Id. ¶ 207.  Ms. George then emailed Plaintiff's union representative to confirm that Plaintiff would be attending orientation, "as we discussed."  Id. ¶ 208.  On June 24th, having not received a response, Mr. Flores emailed Plaintiff and stated: "Hi Kim, not sure if you responded to anyone yet, but I want to let you know that the June 28th Refresher Skills Night with Dragana is confirmed."  Id. ¶ 209.  He also noted that he had called and left a message on Plaintiff's phone.  Id.  In addition, Ms. George testified that she spoke with Plaintiff and her union representative and told them that the orientation would be scheduled for June 28, 2013.  Id. ¶ 213.

Plaintiff testified that on June 26th, she became aware that the orientation was scheduled for June 28th.  Id. ¶ 214.  On that date, instead of responding to any of the Hospital's representatives who had contacted her, Plaintiff emailed her union representative and asked her to "remind [Ms. George] and [Mr. Flores] of appropriate protocol during the grievance process."  Id. ¶ 210.  Plaintiff later testified that she was instructed that "the flow of communication during these types of negotiations has to be through the union."  Id. ¶ 211.  On June 28th, having still not received any communication from Plaintiff, Mr. Flores emailed her and said: "Sorry, I know you are busy but I really need to know if you are coming in tonight or not.  I was informed that you have not confirmed this date yet.  I really need you [to] call the staffing office by 3pm today to finalize our plan.  I am also going to reach to you by phone today."  Id. ¶ 215.

Plaintiff did not show up for the June 28, 2013 orientation.  Id. ¶ 220.  At her deposition, Plaintiff explained: "I never confirmed and so I don't understand why arrangements would be

made for somebody who never confirmed." Id. ¶ 217.

Mr. Flores testified that this one-on-one training was not standard practice at the Hospital and was an attempt by the Hospital to accommodate Plaintiff's training requests. Id. ¶ 219. Because Plaintiff was the only nurse who was scheduled to be educated on June 28th, a nurse educator and MCH float nurse were arranged specifically to provide Plaintiff's orientation. Id. ¶ 218. Ms. George indicated that despite Plaintiff's lack of communication, the Hospital "had kept the educator and the preceptors in all the 3 areas for her as we planned." Panzini Decl. Ex. 35.

On June 29th, a Hospital nurse educator notified various other employees that Plaintiff did not attend the orientation and had not notified anyone that she would not be attending. Def.'s R.56 Stmt. ¶ 222. On July 1st, Ms. George emailed Ms. Shears and the director of the CNP, advising them of Plaintiff's failure to attend the orientation. Id. ¶ 223. Ms. Shears directed that going forward, Plaintiff was not to be scheduled for any shifts. Id. ¶ 224; Panzini Decl. Ex. 35.

In 2013 and 2014, Plaintiff periodically provided her availability to Hospital administrators. See, e.g., Declaration of Kim Paradisis ("Paradisis Decl."), Ex. P-01255, Dkt. No. 63-1. However, after she did not show up to the June 28, 2013 orientation, she was not scheduled to work at the Hospital again. See Pl.'s Resp. R.56 Stmt. ¶ 9(9); Paradisis Decl. Ex. P-01256.

**F. Pursuit of Outstanding Grievances**

From September 11, 2013 to March 4, 2015, Plaintiff and her Union disputed the Union's handling of her outstanding grievances. The Union explained that while the grievances were held in abeyance pending settlement discussions with the Hospital, these discussions broke down after Plaintiff failed to attend the June 28, 2013 orientation. Def.'s R.56 Stmt. ¶ 227. In addition, while the Union agreed to pursue three of her remaining grievances, it declined to further challenge the verbal warning, which the Union believed was "no longer an issue as it would be removed after six (6) months from [Plaintiff's] personnel file . . . and therefore no longer exists." Panzini Decl.

Ex. 36; Def.'s R.56 Stmt. ¶¶ 228, 241.  After the Union attempted for a year and a half to work with Plaintiff to pursue her remaining grievances, Plaintiff concluded that she was not comfortable entrusting her livelihood to the Union.  Def.'s R.56 Stmt. ¶ 243.

### G.  Plaintiff's EEOC Charge and Subsequent Lawsuit

On April 12, 2013, Plaintiff filed a charge with the U.S. Equal Employment Opportunity Commission ("EEOC").  Compl. ¶ 6(2).  Plaintiff then filed a charge with the New Jersey Division on Civil Rights ("DCR") on June 12, 2013.  Panzini Decl. Ex. 4, D-21.  The EEOC issued a right-to-sue letter on July 18, 2013.  Id.  These charges only asserted that Defendant had retaliated against her – they contained no mention of unlawful discrimination based on color, race, or national origin.  Id.  On October 4, 2013, Plaintiff filed the instant Complaint, asserting claims for employment discrimination and retaliation under Title VII.[6]

On July 26, 2014, Plaintiff filed a subsequent charge with the DCR.  Panzini Decl. Ex. 4, D-22.  On July 31, 2014, Plaintiff filed another charge with the EEOC.  Id.  Again, for both of these charges Plaintiff only checked the box marked "Retaliation."  Id.  On July 10, 2015, Plaintiff filed a third charge with the DCR and EEOC, alleging for the first time that she had faced discrimination based on race, color, and national origin.  Panzini Decl. Ex. 4, D-23.

## II.   LEGAL STANDARD

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that "there is no genuine dispute as to any material fact and the

---

[6] The Court notes that, at least before her most recent EEOC charge was filed in 2015, Plaintiff appears to have failed to exhaust her administrative remedies for any claims of discrimination, as she only alleged retaliation in her initial EEOC charges.  See, e.g., Antol v. Perry, 82 F.3d 1291, 1295-96 (3d Cir. 1996).  Nevertheless, the Third Circuit has held that "failure to exhaust is an affirmative defense and should not be the basis of a sua sponte dismissal."  McIntyre v. City of Wilmington, 360 F. App'x 355, 356 (3d Cir. 2010) (citing Ray v. Kertes, 285 F.3d 287 (3d Cir. 2002)).  Because Defendant did not assert failure to exhaust in its Answer and did not seek dismissal on that basis, the Court must proceed to the merits of Plaintiff's discrimination claim.

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986).  "[S]ummary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party."  Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988).

When the Court considers a motion for summary judgment, "all facts and inferences are construed in the light most favorable to the non-moving party."  Boyle v. Cty. of Allegheny Pennsylvania, 139 F.3d 386, 393 (3d Cir. 1998).  Where the Plaintiff is proceeding pro se, the Court construes the pleadings liberally and holds them to a less stringent standard than those filed by attorneys.  Giles v. Kearney, 571 F.3d 318, 322 (3d Cir. 2009) (citing Haines v. Kemer, 404 U.S. 519, 520-21 (1972)).

## III.   ANALYSIS

Plaintiff has asserted two claims under Title VII against the Hospital: (1) discrimination on the basis of color, race, and national origin; and (2) retaliation against Plaintiff for the exercise of protected activities.

For both discrimination and retaliation claims under Title VII that rely on circumstantial evidence,[7] the Court employs the familiar McDonnell Douglas burden-shifting framework.  See Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).  Under this standard, a Plaintiff must first prove a prima facie case of unlawful action by the employer.  McDonnell Douglas, 411 U.S. at 802.  "To establish

---

[7] Plaintiff has pointed to no direct evidence of discrimination based on color, race, or national origin.  The only fact that conceivably implicates race is Plaintiff's claim that Ms. Shears "mouthed" to her "something like '[y]ou people want everything handed to you.'"  Def.'s R.56 Stmt. ¶ 158.  Even assuming that this actually occurred, despite the fact that it does not appear on a transcript of the meeting it allegedly occurred during, id. at 35, n.14, the phrase "you people" has been held to be "too ambiguous to constitute direct evidence of discrimination when used in isolation."  Anderson v. Wachovia Mortgage Corp., 621 F.3d 261, 269 (3d Cir. 2010).  Thus, Plaintiff's claims are subject to the McDonnell Douglas burden-shifting framework.

a prima facie case at summary judgment, 'the evidence must be sufficient to convince a reasonable factfinder to find all of the elements of [the] prima facie case.'" Burton v. Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013) (quotation omitted).

To establish employment discrimination under Title VII, a plaintiff must show that: "(1) s/he is a member of a protected class; (2) s/he was qualified for the position s/he sought to attain or retain; (3) s/he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008).

To establish unlawful retaliation under Title VII, "a plaintiff must tender evidence that '(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.'" Moore v. City of Philadelphia, 461 F.3d 331, 340–41 (3d Cir. 2006) (quoting Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995)).

If the plaintiff meets this initial burden, the burden shifts to the defendant, who must "articulate one or more legitimate, non-discriminatory reasons for its employment decision." Waldron v. SL Indus., Inc., 56 F.3d 491, 494 (3d Cir. 1995). This burden has been described as "relatively light," and is "satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." Burton, 707 F.3d at 426 (citing Tomasso v. Boeing Co., 445 F.3d 702, 706 (3d Cir. 2006)).

If the defendant is able to articulate such a reason, the burden shifts back to the plaintiff, who must demonstrate that the employer's proffered reasons were merely a pretext for intentional discrimination. McDonnell Douglas, 411 U.S. at 804. To survive a motion for summary judgment, a plaintiff must point to evidence which: (1) "casts sufficient doubt upon each of the legitimate

13

reasons proffered by the defendant so that a factfinder could reasonable conclude that each reason was a fabrication;" or (2) allows the factfinder to reasonably conclude that "discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir. 1994).  A plaintiff can demonstrate the latter by "showing that the employer in the past had subjected [her] to unlawful discriminatory treatment, that the employer treated other, similarly situated persons not of [her] protected class more favorably, or that the employer has discriminated against other members of [her] protected class or other protected categories of persons."  Id. at 765.

### A.  Discrimination Under Title VII

Plaintiff's first claim against the Hospital is for discrimination on the basis of color, race, and national origin.  See Compl. ¶ 8(5).  Plaintiff alleges that the Hospital discriminated against her in the following ways:[8] (1) failing to provide requested education and training; (2) levying "unjust discipline" through an investigatory hearing, verbal warning, and grievance hearing pertaining to issues that arose during Plaintiff's shift on January 31, 2013; (3) allegedly removing Plaintiff from the work schedule on March 8, 2013; (4) issuing a 2012 performance evaluation that Plaintiff believes was "unfavorable"; and (5) allegedly removing Plaintiff from the work schedule on September 2, 2013.  See Compl. ¶ 5(2); Pl.'s Resp. R.56 Stmt. ¶ 2(2-11).

Defendant argues that Plaintiff has failed to meet her burden to show that (1) she suffered adverse employment action, and (2) that any such action occurred under circumstances giving rise to an inference of intentional discrimination.[9]  Defendant further argues that even if Plaintiff could

---

[8] Although the Complaint states that discriminatory action occurred on March 15, 2013, it is unclear what the Plaintiff is referring to.  When asked at her deposition what discriminatory actions occurred on March 15, 2013, Plaintiff responded that she "would have to go back and look at [her] notes."  Def.'s R.56 Stmt. ¶ 262.  The same is true for March 25, 2013.  Id. ¶ 264.

[9] In addition to the reasons set forth below, Plaintiff cannot demonstrate that any of the alleged adverse employment actions occurred under circumstances giving rise to an inference of

meet this initial burden, she failed to rebut Defendant's proffered non-discriminatory reasons for any such adverse employment action.  The Court agrees.

1.  <u>Defendant's Failure to Provide Additional Education and Training</u>

Plaintiff fails to demonstrate that the Hospital's failure to provide her with additional education and training constituted an adverse employment action.  When she returned to the Hospital following her termination in 2012, Plaintiff requested three types of training: (1) registration for an NRP course; (2) registration for a PALS course; and (3) computer training and shadowing of an MCH float member through various units.  Def.'s R.56 Stmt. ¶ 33.

On September 17, 2012, Plaintiff received NRP training.  <u>Id.</u> ¶ 36.  As for Plaintiff's remaining requests, she fails to demonstrate that Defendant's failure to provide such training constituted an adverse employment action.  According to the CNP and other Hospital employees, PALS was not required to work in pediatrics, and was not even provided to many of the Hospital's

---

intentional discrimination.  <u>See</u> <u>Makky</u>, 541 F.3d at 214.  The only conceivable fact that Plaintiff can point to that even arguably relates to race is her claim that Ms. Shears "mouthed" to her "something like '[y]ou people want everything handed to you.'"  Def.'s R.56 Stmt. ¶ 158.  It is worth noting that this statement does not appear in the transcript of an audio recording of the meeting during which it was supposedly made.  <u>Id.</u> at 35, n.14; Panzini Decl. Ex. 4, Ex. P-3F.  In any event, even if this phrase was used, the context does not indicate that it was racial in nature – Ms. Shears just as easily could have been referring to all nurses or all MCH float nurses.  <u>See, e.g.</u>, <u>Smalls v. New York Hosp. Med. Ctr. of Queens</u>, No. 13-1257, 2015 WL 5437575, at *10 (E.D.N.Y. Sept. 15, 2015) (holding that use of the phrase "you people," without evidence that it was intended to refer to race, did not give rise to an inference of discrimination).  In fact, Plaintiff herself suggested that she did not know whether Ms. Shears was referring to race.  Def.'s R.56 Stmt. ¶ 158.  Moreover, there is no indication that it played any role in any alleged adverse employment action.  Other than this offhand statement, Plaintiff has submitted nothing more than her post-hoc, "subjective belief that race played a role in these employment decisions," which is "not sufficient to establish an inference of discrimination."  <u>Groeber v. Friedman & Schuman, P.C.</u>, 555 F. App'x 133, 135 (3d Cir. 2014).  The Third Circuit is clear that "speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn."  <u>Parodo v. Philadelphia Hous. Auth.</u>, 610 F. App'x 163, 166 (3d Cir. 2015) (quotation omitted).  For these reasons, Plaintiff has not satisfied the fourth element of a prima facie case of discrimination for any of her claims of alleged adverse employment action.

full-time staff.  Id. ¶¶ 50-53, 55, 114-118, 153.  In addition, the Hospital's nursing requirements clearly indicate that PALS is not a requirement for MCH float nurses.  Id. ¶ 56.  In fact, Plaintiff appeared to acknowledge at a hearing that PALS certification may not be required, stating that she was simply "asking for what's prudent" and decrying that the Hospital was only doing what was "minimally required."  Panzini Decl. Ex. 4, Ex. P-3F, at p.28.  Similarly, Plaintiff has submitted no evidence that she was entitled to other requested training, which the grievance process repeatedly concluded was not required under the CBA.  See, e.g., Def.'s R.56 Stmt. ¶ 160.[10]

Moreover, the Hospital *offered and actually did provide* Plaintiff with additional training and education.  For example, the Hospital provided Plaintiff with four hours of classroom training on November 2, 2012.  Id. ¶ 66.  Further, following Plaintiff's education and training grievance, the Hospital scheduled an additional eight-hour orientation session on June 28, 2013, a date suggested by Plaintiff, despite having no contractual obligation to do so.  Id. ¶¶ 204, 208-209.  Plaintiff only did not receive this training because she failed to attend.  Id. ¶¶ 220-221.

The Hospital's failure to provide additional education and training also did not constitute adverse action because it had no impact on the terms of Plaintiff's employment.  An adverse employment action for discrimination claims under Title VII is one that is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment."  Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 (3d Cir. 2004) (quotation omitted); see also 42 U.S.C. § 2000e-2(a)(1).  Thus, denying training requests is not an adverse employment action unless the plaintiff can show material harm from the denial.  See, e.g., Kellman v. Metro. Transp.

---

[10] Thus, even if Plaintiff could somehow show that there was a genuine dispute of material fact as to whether PALS was actually required for MCH float nurses, the Hospital's decision not to provide it was, at worst, an erroneous non-discriminatory business decision based on the 2012 RN Requirements and the representations of at least two CNP employees.  Under McDonnell Douglas, Plaintiff has failed to show that such a decision was pretextual.

Auth., 8 F. Supp. 3d 351, 374 (S.D.N.Y. 2014).  Here, Plaintiff herself testified that she was permitted to work without the requested education and training, and that she was not otherwise reprimanded, docked pay, suspended, or terminated due to her failure to receive such training.  See Def.'s R.56 Stmt. ¶¶ 68, 252.  Therefore, Plaintiff did not suffer adverse employment action.

2. <u>Defendant's Actions Following Reports of Safety Issues During Plaintiff's January 31, 2013 Shift</u>

Defendant's investigation and discipline pertaining to safety issues that arose during Plaintiff's January 31, 2013 shift also did not constitute adverse employment action.  Even if Plaintiff could establish a prima facie claim of discrimination, Defendant has proffered legitimate, non-discriminatory reasons for any such adverse action.

First, the Hospital's investigatory meeting on March 13, 2013 did not constitute an adverse employment action.  An investigation alone, without material consequences to an individual's employment, is not an adverse employment action.  See Campbell v. Supreme Court of New Jersey, No. 11-555, 2014 WL 7343225, at *6 (D.N.J. Dec. 23, 2014) (citation omitted) (noting that "the filing of a disciplinary action or an investigation into potential misconduct does not qualify as an adverse employment action in and of itself"); cf. Jones v. Se. Pa. Transp. Auth., 796 F.3d 323, 326 (3d Cir. 2015).  Plaintiff has submitted no evidence suggesting that the Hospital's investigatory meeting on March 13, 2013 tangibly impacted her employment in any way.

Similarly, discipline itself does not qualify as an adverse employment action unless it "effect[s] a material change in the terms or conditions of [the plaintiff's] employment."  Weston v. Pennsylvania, 251 F.3d 420, 431 (3d Cir. 2001), overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006); see also Deans v. Kennedy House, Inc., 587 F. App'x 731, 734 (3d Cir. 2014).  Here, according to the Hospital and Union, a verbal warning was the lowest form of discipline at the Hospital, was removed from Plaintiff's file six

months after it was issued, and could no longer be used in any subsequent disciplinary process. Def.'s R.56 Stmt. ¶¶ 141, 228, 241.  Plaintiff was not demoted, docked pay, suspended, or terminated as a result.  Therefore, the verbal warning was not an adverse employment action.

Moreover, even if Plaintiff could demonstrate a prima facie case of discrimination for the investigation or issuance of a verbal warning, Defendant has met its burden under McDonnell Douglas to show that the issuance of a verbal warning was at least a non-discriminatory business decision, if not entirely warranted.  Defendant's investigation revealed up to seven errors that Plaintiff made on her January 31, 2013 shift.  Def.'s R.56 Stmt. ¶ 139.  As Ms. George and Mr. Flores both testified, Plaintiff could have received a verbal warning for any of the listed offenses, and Plaintiff's mistakes in weighing the baby could have justified a more significant level of discipline.  Id. ¶ 143.  Plaintiff has not adduced competent evidence showing that the seven violations were fabricated or that her race was the motivating force behind the discipline, and therefore has not met her burden under McDonnell Douglas to show that the Hospital's proffered reasons for the investigation and discipline were pretextual.  411 U.S. at 804.

### 3.  Plaintiff's Alleged Removal from the Work Schedule on March 8, 2013

Plaintiff cannot establish a prima facie case of discrimination for her claim that Defendant removed her from the work schedule on March 8, 2013 because she cannot prove that she was subject to any adverse employment action.

Although Ms. George warned Plaintiff that she would be removed from the schedule if she did not attend a March 8, 2013 meeting, Def.'s R.56 Stmt. ¶ 124, Plaintiff has provided no evidence that this actually occurred.  In fact, following the date she was supposedly removed from the schedule, Plaintiff attended a meeting at the Hospital on March 13th, communicated with the Hospital regarding training on March 24th, and actually worked two overnight shifts at the Hospital on March 29th and April 20th.  Id. ¶¶ 127, 162, 258.  It is evident that Plaintiff was not

taken off the schedule on March 8, 2013.

Ms. George's warning that Plaintiff would be taken off the schedule also does not qualify, as "harsh words that lack real consequences" do not constitute adverse employment actions. Sconfienza v. Verizon Pennsylvania Inc., 307 F. App'x 619, 622 (3d Cir. 2008); see also LeBlanc v. Hill Sch., No. 14-1674, 2015 WL 144135, at *16 (E.D. Pa. Jan. 12, 2015) (holding that "when an employer threatens to take an action but does not in fact take that action, the threat does not constitute a materially adverse employment action"). Thus, Plaintiff has not demonstrated that she was subject to adverse employment action.

### 4. Plaintiff's 2012 Performance Evaluation

Defendant's May 17, 2013 performance evaluation of Plaintiff did not constitute an adverse employment action, and even if it did, Plaintiff has failed to rebut Defendant's non-discriminatory explanations for the contents of Plaintiff's evaluation.

Plaintiff asserts that she was subjected to adverse employment action when she received an "unfavorable performance evaluation" for 2012. See Compl. ¶ 8(4). However, Plaintiff has not even shown that her evaluation was negative. Plaintiff received a "Successful" mark in every reviewable category except "Communication," where she received a "Needs Improvement." Def.'s R.56 Stmt. ¶¶ 193-195; Panzini Decl. Ex. 8, Ex. DG-16. Ms. George testified that this was not a negative review, and that Plaintiff was meeting "all the competency that is required to work as a per diem." Def.'s R.56 Stmt. ¶ 196.

Furthermore, even if the evaluation could be construed as negative, it would still not rise to the level of material adversity. It is well-established that "[a] negative evaluation, by itself, is not an adverse employment action." Walker v. Centocor Ortho Biotech, Inc., 558 F. App'x 216, 220 (3d Cir. 2014) (citing Weston, 251 F.3d at 431). For discrimination claims, "a notation in an employee's record" only constitutes an adverse action if it "affects the 'compensation, terms,

conditions or privileges' of employment." Sconfienza, 307 F. App'x at 622 (quoting

Robinson, 120 F.3d at 1298); see also Harley v. Geithner, No. 07-3559, 2010 WL 3906642, at *11

(D.N.J. Sept. 29, 2010), aff'd sub nom. Harley v. U.S. Sec'y of Treasury, 444 F. App'x 594 (3d

Cir. 2011). Plaintiff has adduced no evidence demonstrating that her 2012 performance evaluation

tangibly impacted her employment.

Finally, even if Plaintiff could make out a prima facie case of discrimination, Defendant

has met its burden under McDonnell Douglas to proffer a non-discriminatory reason for the

contents of Plaintiff's evaluation. The "Needs Improvement" notation regarding Plaintiff's

communication skills was based on the verbal warning issued to Plaintiff on April 6, 2013, which

concluded that Plaintiff "violated [the Hospital's] service excellence standards/communication

standards." Def.'s R.56 Stmt. ¶ 139.[11] Plaintiff has provided no evidence showing that the ratings

and notations in her evaluation were somehow improper, besides her subjective belief that the

evaluation "included references to unjust, fraudulent and fabricated discipline." Compl. ¶ 8(4).

As described above, Plaintiff has not shown that each of the violations stemming from Plaintiff's

shift on January 31, 2013 were fraudulent or fabricated. Given this, Plaintiff "did not create a

record that would cast any doubt upon the validity of the evaluation, and, therefore, [s]he failed to

show that the [Hospital's] stated reasons for criticizing [her communication skills] were

pretextual." Ponton v. AFSCME, 395 F. App'x 867, 874 (3d Cir. 2010).

     5.   Plaintiff's Alleged Removal from the Work Schedule on September 2, 2013

Lastly, Plaintiff asserts that Defendant unlawfully discriminated against her by removing

her from the schedule following her failure to attend the June 28, 2013 orientation. Defendant

---

[11] In addition, Ms. George and Ms. Shears repeatedly stated in the May 2, 2013 grievance hearing
that the Hospital had issues with Plaintiff's ability to effectively communicate with the nurses she
worked with and her superiors. See, e.g., id. ¶¶ 180-181.

argues that even if Plaintiff could establish a prima facie case of discrimination, it has proffered a legitimate, non-discriminatory reason for Plaintiff's removal from the schedule.  The Court agrees.

Assuming arguendo that Plaintiff could establish a prima facie case of discrimination based on her removal from the schedule, Defendant has nonetheless met its burden under McDonnell Douglas to provide a legitimate, non-discriminatory reason for its decision.  Title VII "does not protect an employee, including [a minority] employee, from an employer's decisions about hiring and firing that are merely erroneous or that fall within the exercise of business judgment free of illegal bias." Davis v. Rutgers Cas. Ins. Co., 964 F. Supp. 560, 573 (D.N.J. 1997).

Here, Defendant argues that it removed Plaintiff from the work schedule because she failed to attend the June 28, 2013 orientation, which she had specifically demanded for a year and claimed was necessary for her to "safely" practice, and for which the Hospital wasted time and resources attempting to provide.  Def.'s R.56 Stmt. ¶¶ 218-19, 225; Panzini Decl. Ex. 35.  Accordingly, Defendant has met its "relatively light" burden to show that its removal of Plaintiff from the work schedule was a business decision, and not motivated by discrimination.

Under McDonnell Douglas, the burden then shifts back to Plaintiff to demonstrate either that Defendant's proffered reason was either "a *post hoc* fabrication or otherwise did not actually motivate the employment action." Fuentes, 32 F.3d at 764.  Plaintiff has adduced no such evidence.[12]

For these reasons, summary judgment is granted for Defendant on Plaintiff's

---

[12] Interestingly, Plaintiff has asserted throughout this litigation that she needed the requested training to "safely" work as an MCH float.  See, e.g., Def.'s R.56 Stmt. ¶¶ 20, 118, 152, 252. Plaintiff cannot have it both ways – she cannot argue that she needed supplemental training to "safely" work as an MCH float nurse, and yet simultaneously claim that Defendant improperly removed her from the schedule when she inexplicably failed to attend said training.

discrimination claims under Title VII.[13]

### A.  Retaliation Under Title VII

Plaintiff's second claim against the Hospital is for retaliation under Title VII.  To establish a prima facie case of unlawful retaliation under Title VII, "a plaintiff must tender evidence that (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action."  Moore, 461 F.3d at 340–41 (quotation omitted).

Plaintiff claims that the Hospital retaliated against her through the following alleged adverse employment actions: (1) failing to provide requested education and training; (2) condoning disparaging remarks; (3) allegedly removing Plaintiff from the work schedule on March 8, 2013; (4) levying "unjust discipline" through an investigatory hearing, subsequent verbal warning, and grievance hearing related to issues surrounding Plaintiff's shift on January 31, 2013; (5) issuing an "unfavorable" 2012 performance evaluation; and (6) allegedly removing Plaintiff from the work

---

[13] Although it is unclear from the Complaint and not briefed by either party, to the extent Plaintiff raises a claim of discrimination based on a hostile work environment, that claim also fails.  To establish a hostile work environment claim under Title VII, a plaintiff must show that: "(1) the employee suffered intentional discrimination because of his/her [race], (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person in like circumstances, and (5) the existence of respondeat superior liability."  Mandel v. M & Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013).  Plaintiff's vague and unsupported claims of disparaging comments by Ms. George and Ms. Shears, as well as a hard handshake by Ms. Shears, fall far short of establishing a prima facie case of hostile work environment.  Plaintiff has not met the first prong, as she herself has questioned whether she was subjected to these alleged actions and comments because of her race, rather than some other reason.  See, e.g., Def.'s R.56 Stmt. ¶¶186, 249, 260.  Plaintiff has also failed to demonstrate that the alleged acts were "sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment," or that they would have detrimentally impacted a reasonable employee of her race.  Mandel, 706 F.3d at 167 (quotation omitted).  These alleged acts and comments are precisely the type of "simple teasing, offhand comments, and [non-serious] isolated incidents'" that do not rise to the level of a hostile work environment.  Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 271 (2001) (quotation omitted).  For these reasons, if Plaintiff raises a hostile work environment claim, it also fails.

schedule on September 2, 2013.  See Compl. ¶ 5(2); Pl.'s Resp. R.56 Stmt. ¶ 2(2-11).  Defendant

argues that Plaintiff failed to establish a prima facie case of retaliation for any of the above actions,

and that even if she did, Plaintiff failed to present facts demonstrating that Defendant's non-

discriminatory reasons for the above actions were merely pretextual.  The Court agrees.

> 1. Plaintiff's Allegations of Adverse Employment Action that Occurred
> Prior to Her Filing of an EEOC Charge

Plaintiff appears to assert that she engaged in numerous protected activities, including: (1)

filing a grievance pertaining to her 2012 termination; (2) being vocal about and filing a grievance

seeking additional education and training; (3) filing a grievance concerning her verbal warning;

and (4) filing an EEOC charge.  See Compl. ¶¶ 1-10(2-4); Pl.'s Resp. R.56 Stmt. ¶ 2(2-11); Panzini

Decl. Ex. 3, Paradisis Dep. 253:15-23; 255:8-15.  Defendant argues that except for Plaintiff's first

EEOC charge, Plaintiff did not engage in any protected activities.  The Court agrees.

The Third Circuit has explained that "the anti-retaliation provision of Title VII protects

those who participate in certain Title VII proceedings (the "participation clause") and those who

oppose discrimination made unlawful by Title VII (the "opposition clause")."  Moore, 461 F.3d at

341 (citing Slagle v. County of Clarion, 435 F.3d 262, 266 (3d Cir. 2006)).  "'Opposition' to

discrimination can take the form of informal protests of discriminatory employment practices,

including making complaints to management."  Id. at 343 (quotation omitted).  When an employee

does so, "the employee must hold an objectively reasonable belief, in good faith, that the activity

they oppose is unlawful under Title VII."  Id. (citations omitted).  Ultimately, "[t]he determinative

question [is] whether the grievance sufficiently articulates an opposition to discrimination or

discriminatory retaliation."  Duffy v. Dep't of State, 598 F. Supp. 2d 621, 631 (D. Del. 2009).

Filing grievances "unrelated to race discrimination [does] not constitute protected activity for

purposes of a Title VII retaliation claim."  Flax v. Delaware, 329 F. App'x 360, 364 (3d Cir. 2009);

see also Barber v. CSX Distribution Servs., 68 F.3d 694, 701-02 (3d Cir. 1995).

Plaintiff's first grievance challenging her January 20, 2012 termination did not constitute a protected activity.  The Hospital terminated Plaintiff because she failed to work a winter holiday; Plaintiff alleged that she had developed pneumonia and was unable work her shift.  Def.'s R.56 Stmt. ¶¶ 14-16.  The grievance Plaintiff filed through her Union made absolutely no reference to discrimination based on color, race, or national origin.  Id. ¶¶ 12, 24.[14]  Thus, because Plaintiff's first grievance "failed to identify any conduct proscribed by Title VII, [it] do[es] not amount to 'protected activity,' and cannot form the basis for a retaliation claim."  Davis v. City of Newark, 417 F. App'x 201, 203 (3d Cir. 2011).

Plaintiff's second grievance, which was filed on February 21, 2013, asserted that the Hospital "fail[ed] to provide adequate education & training" and "fail[ed] to support shared decision making for ongoing education and evidence based practice/education/PI."  Panzini Decl. Ex. 4, D-18.  This grievance also makes no mention of any type of discrimination protected by Title VII, which Plaintiff herself acknowledged.  Panzini Decl. Ex. 3, Paradisis Dep. 198:22-25.  Because Plaintiff did not allege discrimination in this grievance, it also does not constitute protected activity.

In her Complaint, Plaintiff also vaguely suggests that Defendant retaliated against her for "communicating discriminatory actions of defendant on April [6], 2013."  Compl. ¶ 7(4).  However, the Court holds that Plaintiff's grievance concerning the verbal warning she received on April 6, 2013 was not protected activity.  Plaintiff's email to Ms. George notifying her of the

---

[14] While Plaintiff now claims that she believes the Hospital was discriminating against her on the basis of color and national origin, she acknowledges that she "didn't call it discrimination at that time," and that the letter she sent the Hospital did not so much as mention discrimination.  See Panzini Decl. Ex. 3, Paradisis Dep. 87:2-3, 91:20-25; Def.'s R.56 Stmt. ¶ 245.

grievance stated only that it was for "unjust discipline," id. ¶ 173, and Plaintiff's request for a hearing only raised issues of "[u]njust discipline" and "[r]etaliation for filing a grievance."[15] The sole reference to discrimination in Plaintiff's April 2013 grievance was the reference to a contract section entitled "Non-Discrimination." Panzini Decl. Ex. 30. Yet during the grievance meeting, Plaintiff never raised the issue of discrimination or otherwise accused the Hospital or any employees of discrimination. Def.'s R.56 Stmt. ¶ 185.

The Third Circuit has stated that an employee's opposition to unlawful discrimination must not be "vague or equivocal." Moore, 461 F.3d at 343. For example, in Perry v. Harvey, 332 F. App'x 728, 733 (3d Cir. 2009), the Third Circuit considered whether an employee had engaged in a protected activity when he filled out a survey making "only oblique reference to racial discrimination." The Court held that the employee had not engaged in a protected activity because "[t]he mere mention of race does not transform a general list of grievances into opposition to unlawful activity under Title VII." Id.; see also Slagle, 435 F.3d at 268 (holding that a "complaint, with its vague allegations of 'civil rights' violations," did not constitute a protected activity). Similarly here, Plaintiff's "unjust discipline" grievance barely mentioned discrimination, and she does not appear to have ever raised the issue or elaborated on any specific discriminatory conduct at the grievance meeting. Accordingly, Plaintiff's April 2013 grievance and May 2, 2013 grievance hearing did not constitute protected activities.

As a result, Plaintiff's earliest protected activity was the filing of her first EEOC charge on April 12, 2013.[16] Importantly though, Defendant did not receive notice of the EEOC charge until

---

[15] Plaintiff's reference to retaliation did constitute protected activity because the grievances allegedly giving rise to the retaliation claim did not challenge any conduct prohibited under Title VII. See Slagle, 435 F.3d at 267 (citing Balazs v. Liebenthal, 32 F.3d 151, 159–60 (4th Cir. 1994)).

[16] In fact, Plaintiff's initial EEOC charges may also fail to constitute protected activity, as Plaintiff did not allege discrimination based on color, race, and national origin in any EEOC filings until

May 22, 2013.  Def.'s R.56 Stmt. ¶ 198.  To make out a prima facie case of retaliation, a plaintiff must show that the employer took "adverse employment action *after or contemporaneous with* the employee's protected activity."  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000) (emphasis added).  In this way, the protected activity and causal relationship prongs dovetail – a plaintiff cannot show any causal relationship if her only protected activity occurred *after* the alleged adverse employment action.  See Warfield v. SEPTA, 460 F. App'x 127, 132 (3d Cir. 2012) (citing Breeden, 532 U.S. at 273) (holding that an employer's "[k]nowledge of an employee's protected conduct is an essential element of establishing a causal connection").  Thus, any alleged adverse employment actions that occurred before May 22, 2013 cannot form the basis of a retaliation claim.

Moreover, even if Plaintiff could demonstrate that she engaged in a protected activity prior to the five actions that occurred before May 22, 2013, none of them constitute adverse employment actions.  To show an adverse employment action for retaliation under Title VII, a plaintiff "must show that a reasonable employee would have found the alleged retaliatory actions 'materially adverse.'"  Moore, 461 F.3d at 341 (quoting Burlington, 548 U.S. at 68).  Unlike the discrimination provision of Title VII, the anti-retaliation provision "is not limited to discriminatory actions that affect the terms and conditions of employment."  Burlington, 548 U.S. at 64.  Thus, a plaintiff can satisfy this prong by showing that an employer's actions "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Id. at 68.  As explained above, Plaintiff was not entitled to additional education and training; was not removed from the work

---

she filed her third charge on July 10, 2015.  See Panzini Decl. Ex. 4, D-23.  Each of Plaintiff's previous charges only asserted erroneous claims of retaliation.  See id. Exs. D-21, D-22.  However, Defendant concedes "that filing an EEOC charge is a protected activity," and appears to treat the date of Plaintiff's first protected activity as May 22, 2013.  Def.'s Br. at 37.  Thus, for the purposes of this motion, the Court will treat Plaintiff's first EEOC charge as her earliest protected activity.

schedule on March 8, 2013; did not receive "unjust discipline" on April 6, 2013; and did not receive an "unfavorable" 2012 performance evaluation.  These employment actions would not dissuade a reasonable employee from making or supporting a charge of discrimination.[17]

As for Plaintiff's vague allegations of disparaging remarks and actions committed by various Hospital employees, these also do not rise to the level of adverse employment actions.  See Def.'s R.56 Stmt. ¶¶ 158, 186, 249.  The Supreme Court has explained that a plaintiff must show "material adversity," which requires the Court to "separate significant from trivial harms." Burlington, 548 U.S. at 68.  Indeed, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."  Id.; see also Pagan v. Holder, 741 F. Supp. 2d 687, 696 (D.N.J. 2010), aff'd sub nom. Pagan v. Gonzalez, 430 F. App'x 170 (3d Cir. 2011) (holding that "a series of workplace slights and petty grievances" did not constitute adverse employment action).

As an initial matter, none of the alleged disparaging comments related directly to Plaintiff's race, and Plaintiff herself testified that she did not know whether any of these statements were discriminatory.  See Def.'s R.56 Stmt. ¶¶ 158, 186, 249.  Plaintiff also did not report any of these statements or actions to Defendant.  See id. ¶¶ 159, 186.  Furthermore, Plaintiff was not in fact dissuaded from engaging in protected activity, as she filed numerous subsequent charges with the EEOC and New Jersey Division of Civil Rights.  See, e.g., Panzini Decl. Exs. 4, D-21-23. Accordingly, the "petty slights" alleged by Plaintiff, even if viewed collectively, do not constitute

---

[17] As explained above, Defendant has also provided legitimate, non-discriminatory reasons for each of these actions, which Plaintiff has failed to rebut.  Thus, even if Plaintiff had set forth a prima facie case of retaliation, Defendant met its burden under McDonnell Douglas and summary judgment is warranted.

the type of "significant harm" that would dissuade a reasonable employee "from making or supporting a charge of discrimination." Burlington, 548 U.S. at 68.

For these reasons, the Court holds that Plaintiff cannot establish a prima facie case of retaliation for all of the alleged adverse employment actions that occurred prior to May 22, 2013.

       2.   Plaintiff's Alleged Removal from the Work Schedule on September 2, 2013

The only alleged adverse employment action that occurred after Defendant received notice of the EEOC charge on May 22, 2013 was Plaintiff's removal from the work schedule. Defendant argues that even if Plaintiff could make out a prima facie case of retaliation for this action, she has failed to meet her burden under McDonnell Douglas to rebut Defendant's legitimate, non-discriminatory reason for Plaintiff's removal. The Court agrees.

As described above, Defendant has proffered a legitimate, non-discriminatory reason for its actions. Defendant argues that Plaintiff was removed from the schedule because she failed to attend the June 28, 2013 orientation, despite the fact that she had repeatedly demanded this additional training (which she was not entitled to under the CBA) for more than a year, and had explicitly identified June 28th as an acceptable day for the orientation. Def.'s R.56 Stmt. ¶ 204. The Hospital further explained this type of one-on-one training was not standard, and that it had specifically arranged for a nurse educator and an MCH float nurse to be present to conduct Plaintiff's orientation. Id. ¶ 218. Because Plaintiff failed to respond to numerous calls and emails in the weeks preceding the June 28th orientation, the Hospital ultimately wasted time and resources planning a gratuitous training that Plaintiff did not attend. Id. ¶¶ 218-19, 225; Panzini Decl. Ex. 35. Accordingly, Defendant has met its "relatively light" burden to show that its removal of Plaintiff from the work schedule was motivated by a legitimate, non-discriminatory reason.

Plaintiff has not met her burden under McDonnell Douglas to show that Defendant's

proffered reason was pretextual. Plaintiff neither presents evidence that would permit a reasonable factfinder to doubt the legitimacy of Defendant's proffered reason, nor has she adduced evidence from which a reasonable factfinder could conclude that an "invidious discriminatory reason was more likely than not" the motivating or determinative force behind Defendant's actions. <u>Fuentes</u>, 32 F.3d at 764. In fact, the record illustrates that Plaintiff's failure to attend the June 28, 2013 orientation led directly to her removal from the schedule – immediately after receiving notice of Plaintiff's no-show, Ms. Shears directed the other Hospital employees not to schedule Plaintiff for any shifts. <u>See</u> Panzini Decl. Ex. 35.

Despite the burden-shifting in <u>McDonnell Douglas</u>, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated [or retaliated] against the plaintiff remains at all times with the plaintiff." <u>DiMare v. MetLife Ins. Co.</u>, 369 F. App'x 324, 328 (3d Cir. 2010) (citing <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981)); <u>see also</u> <u>Shaner v. Synthes</u>, 204 F.3d 494, 501 (3d Cir. 2000). Here, Plaintiff has failed to produce any evidence from which a reasonable factfinder could conclude that Defendant intentionally discriminated against her based on color, race, or national origin or retaliated against her for engaging in protected activities.

## IV. CONCLUSION

For the reasons set forth herein, Defendant's Motion for Summary Judgment, Dkt. No. 58, is **GRANTED**.

**Dated: September 6, 2016**

*/s Madeline Cox Arleo*
**Hon. Madeline Cox Arleo**
**UNITED STATES DISTRICT JUDGE**
